**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ERNEST A. GOMEZ, | ) |
|       Plaintiff, | ) |
| v. | ) No. 04 C 6108 |
| ALLIED SECURITY SERVICES, | ) Judge Rebecca R. Pallmeyer |
|       Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ernest Gomez worked for Defendant Allied Security Services ("Allied") at two different locations over an eight-month period ending in May 2004. In this suit, Gomez contends that Allied failed to provide training, transferred him, and ultimately discharged him, on the basis of his national origin. Allied now moves for summary judgment and, for the reasons presented here, the motion is granted.

## FACTS

Plaintiff initially applied for a management position with Allied on July 21, 2003. (Def.'s 56.1 ¶¶ 5,6.)[1] He was not hired at that time, but John Borgens, Allied's Human Resources Manager, retained his resume. (*Id.* ¶ 7.) The following month, when Allied entered into a contract to provide security at the Museum of Science and Industry ("Museum"), Borgens called Plaintiff to interview for a position as Operations Manager for security at the Museum. (*Id.* ¶ 11.) Plaintiff interviewed with Peter Moreau, the account manager for the Museum account, and with Mark Anderson, who worked for Defendant as a "transition manager" but later went to work directly for the company that managed the Museum. (*Id.* ¶¶ 12, 13.) Moreau testified that the decision to hire Plaintiff was his;

---

[1] Defendant's Local Rule 56.1 Statement of Material Facts is cited as "Def. 56.1 ¶ __." Plaintiff's Response to Defendant's Statement of Facts Pursuant to Local Rule 56.1 is cited as "Pl. 56.1 Resp. ¶__."

Mark Anderson participated in the interview because, Moreau explained, Anderson just "want[ed] to meet the guy . . . to make sure that there are no glaring errors that [Moreau] missed." (Pl. 56.1 ¶ 111[2], citing Moreau Dep. at 56.) Moreau chose Plaintiff for the position on the strength of his leadership and management experience, and based on Moreau's perception that Plaintiff was "willing to take ownership" of the project and was not one to play "political games." (Pl. 56.1 ¶¶ 110, 112.) According to Plaintiff, Moreau told him he was a desirable candidate because he "looked white" and "talked white" but is in fact a member of a minority group. (*Id.* ¶ 113, citing Gomez Dep. at 155–56.)

Plaintiff accepted Moreau's offer of the position as Operations Manager at the Museum beginning on September 1, 2003, reporting to both Mark Anderson and Peter Moreau, at a rate of pay negotiated between Allied and the Museum. (Def. 56.1 ¶¶ 14–17.) Moreau himself reported to Anderson and to Tony Simmons, Allied's Vice President of Operations for the Chicago Region (*id.* ¶ 21)[3]; four managers reported to Plaintiff. (*Id.* ¶ 23.)

### A.     Plaintiff's Performance at the Museum

Operationally, Plaintiff's performance was exceptional. (*Id.* ¶ 24.) Moreau testified that "[w]hen it came to getting stuff done, [Plaintiff] took ownership," and John Borgens called Plaintiff's performance "perfect." (Pl. 56.1 ¶¶ 116, 117.) Borgens recalled that Greg Prather, the Director of Facilities for the Museum's property management firm "loved [Plaintiff] and said he did a great job." (*Id.* ¶ 117, citing Borgens Dep. at 36.) Moreau received a few complaints about Plaintiff's temper and believed Plaintiff had a tendency to "rub people wrong," (Def.'s 56.1 ¶¶ 25, 26), but in Tony Simmons's view, Plaintiff's temper was not "anything that was out of the norm." (Pl. 56.1 ¶ 118, citing Simmons Dep. at 26.) Moreau learned that Plaintiff had occasionally gone over his

---

[2]     Plaintiff's Statement of Additional Facts that Require Denial of Summary Judgment is cited as "Pl. 56.1 ¶___."

[3]     Plaintiff disputes this (Pl. 56.1 Resp. ¶ 21), but cites nothing in the record in support.

2

(Moreau's) head to discuss issues directly with Simmons or with Museum staff, and he discussed the issue with Simmons. (Def.'s 56.1 ¶¶ 27,28.) Again, however, Simmons did not take this as a serious matter. (Pl. 56.1 ¶ 119.) Simmons testified that he recalled hearing at some point about an incident in which Plaintiff had raised a question about Peter Moreau's performance with Allied's client. (Simmons Dep. at 26.) Simmons interpreted the incident as evidence that Plaintiff "is ready for promotion and he's jumping at the bit to get his next step and to get his opportunity, and maybe a little too overeager," but he did not "take it as anything that was negative." (*Id.* at 28.) In fact, Simmons testified that Plaintiff "was certainly someone that . . . we had our eye on" for promotion, as he had, in Simmons's words, "the degree, he had the police background, he had the management presence." (Def.'s 56.1 ¶¶ 29, 30.) Plaintiff disputes that he was targeted for promotion, but the only evidence he cites is his own testimony that Simmons had hired or promoted other workers, (Pl. 56.1 Resp. ¶¶ 29, 30, citing Gomez Dep. at 90-92), and it is undisputed that Simmons discussed the possibility of promoting Plaintiff with other area managers on more than one occasion. (Def. 56.1 ¶ 31.)

During the time that Plaintiff was working at the Museum, Simmons did in fact offer him a position as Account Manager at another facility serviced by Allied, the Boeing building. (*Id.* ¶ 32.) The Account Manager position is generally a higher-level position within the Allied hierarchy than Operations Manager, but the Boeing building is much smaller than the Museum, the Account Manager at that facility managed a smaller staff than did Plaintiff, and the pay—a function of Allied's negotiation with its client at each location—was almost $10,000 less than what he was earning at the Museum. (*Id.* ¶¶ 33, 34.)[4] Plaintiff testified that he asked Simmons "if they [Allied] were trying

---

[4] Again, Plaintiff disputes this assertion, but nothing in the portions of his own deposition testimony that he cites is inconsistent with it. (Pl. 56.1 Resp. ¶¶ 33, 34, citing Gomez Dep. at 188-93.) Plaintiff contends the "Boeing client" had difficulties getting along with two Allied managers, but he cites no non-hearsay testimony to that effect. (Pl. 56.1 ¶ 131, citing Gomez Dep. at 192–93.)

3

to get rid of him," and Simmons replied, "No, we're not trying to get rid of you. But we can use you over there for this account." (Gomez Dep. at 192.) Plaintiff told Simmons, "Tony, respectfully I'm going to have to decline." Simmons responded by telling Plaintiff he understood the decision, but inviting Plaintiff to "get back to him in a couple of days" if he should change his mind. (Gomez Dep. at 193.) Simmons went on to assure Plaintiff that Allied did not "want to lose a good guy like [Plaintiff] over at the Museum" because Plaintiff had "been doing a good job training [his] subordinates." (Def. 56.1 ¶¶ 37, 38; Gomez Dep. at 192–93.)

### B. April 2004 Incident

In April 2004, a female Museum employee contacted Plaintiff and reported a dispute with a security officer. (Def. 56.1 ¶ 39.) Plaintiff initially spoke with both the Museum employee and the security officer. He then called the Museum's guest services manager to assist in resolving the problem. (*Id.* ¶ 40.) After the guest services manager arrived, he and Plaintiff placed the feuding employees in separate rooms. (*Id.* ¶ 42.) While Plaintiff was speaking to the female Museum employee, she swore at him several times. After what he characterized as "some beration" and her own repeated use of "F words," Plaintiff told her, "Don't fucking speak to me that way." (*Id.* ¶¶ 43, 44; Gomez Dep. at 141–42.) At some point thereafter, Gary Simmons received a phone report concerning an incident in which Plaintiff had cursed at a Museum employee; Simmons accepted the Museum's invitation to participate in an investigation of the incident. (Def. 56.1 ¶ 45.)

Within a few days afterwards, Simmons called Plaintiff in to a meeting at which he admitted using foul language with the female Museum employee. (*Id.* ¶ 47.) Plaintiff claims Simmons told him he believed Plaintiff had lied about the incident, but the page of his own deposition that he cites makes no mention of any such belief (Pl. 56.1 ¶ 137, citing Gomez. Dep. at 179), and Simmons himself testified that Plaintiff "basically substantiated that he had acted inappropriately." (Simmons Dep. at 30.) Simmons testified, further, that the Museum had a policy of "zero tolerance for someone losing their temper and . . . cursing, whether it's at an employee or in a conversation with

4

an employee." (*Id.*) Accordingly, Simmons testified he recognized that Plaintiff would have to be removed from his position at the Museum. (Simmons Dep. at 30–31.) Plaintiff disputes Simmons's assertion that the Museum had any such "zero tolerance" policy, (Pl. Resp. ¶¶ 48-50), but the only evidence he cites is Moreau's testimony that Moreau is not aware that the female Museum employee was herself disciplined, and that the Museum's "zero tolerance" policy had never before "been used on management personnel." (Moreau Dep. at 71, 72.) Moreau in fact explained that the policy had "only been used on floor staff because that's the only violations that we were aware of at the time." (*Id.* at 71.) There is no indication in the record whether the female employee's use of profanity was brought to the attention of her own managers. Plaintiff contends that Moreau described Plaintiff's meeting with the female employee as "minority against minority," (Gomez Dep. at 151); he does not say where or when Moreau made this statement, and Moreau testified that it never occurred to him that Plaintiff's and the female employee's minority status "made a difference." (Moreau Dep. at 94.)

Simmons removed Plaintiff from his position at the Museum on April 23, 2004, a decision Defendant characterizes as a suspension. (Def. 56.1 ¶ 52.; Simmons Dep. at 34–35.) Plaintiff recalls being told "in no uncertain terms . . . that [he] was fired", not suspended. (Pl. 56.1 ¶ 138; Gomez Dep. at 179). It is undisputed, however, that Simmons required Plaintiff to attend a course on dealing with stressful situations (Def. 56.1 ¶ 53), a course that presumably would not have been necessary had Plaintiff been permanently discharged. In any event, just a few days later, Simmons decided the one-week suspension was harsh in light of the circumstances and called Plaintiff back to work in a position as Account Manager at the Sears Tower, another Allied account. (Def. 56.1 ¶ 55.) When Peter Moreau called Plaintiff, Plaintiff found the decision confusing but was excited and happy and told Moreau he had "made [his] day." (Pl. 56.1 ¶ 159; Def. 56.1 ¶58; Gomez Dep. at 176–77, 198.) Plaintiff noted in his deposition testimony that the job was his family's sole source of income. (Gomez Dep. at 197.) He had been earning $45,000 annually in his position at the

5

Museum; the Account Manager position at the Sears Tower paid "40 and change . . . with a potential bonus." (*Id.* at 199.)

### C. Plaintiff's Tenure as Account Manager at the Sears Tower

It appears from the record that Allied was engaged in continuing negotiations with the new owner of the Sears Tower for the security services contract. Plaintiff testified that security costs were a "budget number" for the building owner and that because Allied "wanted this [the Sears Tower contract] as a flagship for [its] Chicago office," Allied "had to go in with a low margin." (Def. 56.1 ¶ 60, 62; Gomez Dep. at 221.) Plaintiff understood that he was to look for ways to "save the client some money." (Gomez Dep. at 231.) He also understood that Tony Simmons expected him to maintain the security program at the Sears Tower during its transition to new ownership. (*Id.*) Simmons told Plaintiff there was a "tenuous situation . . . between the existing security and [Allied] security," and that Plaintiff's role was to "get in there, figure out what could be done, and then report to him." (*Id.* at 232; Def. 56.1 ¶ 65.)

Because there was at the Sears Tower no security manager (the person with whom an Allied account manager would ordinarily have direct contact), Simmons wanted Plaintiff to "distance himself" from client communication and "run just the security part of the process." (Def. 56.1 ¶ 71; Simmons Dep at 57.) He directed Plaintiff to refer any client inquiries to him and to avoid having any discussions with the building's new managers concerning Allied's services or building security policies. (Def. 56.1 ¶ 70; Gomez Dep. at 235.) If someone asked Plaintiff something about security, Simmons instructed, Plaintiff was to refer that inquiry to Simmons. (Def. 56.1 ¶ 66.) When Plaintiff questioned Simmons about why he was not being included in meetings with the Sears Tower's new owners, Simmons told him that these meetings were "not at [his] level," and that Simmons and his own superior, Mimi Lanfranchi, would handle the negotiations for the new security contract. (*Id.* ¶¶ 67–69; Gomez Dep. at 232–34; Simmons Dep. at 46, 51.)

At one point, Plaintiff spoke to Simmons about what he perceived to be improper billing

6

entries that he discovered upon taking up his new assignment at the Sears Tower. (Def. 56.1 ¶ 73.) Simmons asked him how he had obtained that information, and when Plaintiff responded that he had seen billing sheets left out by his predecessor, Simmons told Plaintiff he should not be doing this. (*Id.* ¶ 74–75.) Plaintiff acknowledges that Sears Tower billing was Simmons's responsibility and that Simmons had to approve any budgets or billing, but notes pages of his deposition in which he testified that Simmons told him he was expected to "watch this budget like a hawk." (Pl. 56.1 Resp. ¶¶ 75, 76; Gomez Dep. at 221.)

Although he could not recall any specifics, Simmons testified that, as noted in a May 3, 2004 memorandum, Simmons learned from Sears Tower staff that Plaintiff had been having discussions with various officers about changes he intended to make once he took over as Account Manager. (Def. 56.1 ¶ 78; Simmons Dep. at 54–55; Simmons Memo May 3, 2004, Gomez Dep. Exh. 15.) Plaintiff denies having any conversations about changes he intended to make, but he does acknowledge having one or two conversations with Allied security officers (not with Sears Tower management personnel) about opportunities to improve the way Allied did things. (Pl. 56.1 Resp. ¶ 82; Gomez Dep. at 227–28.) Simmons's May 3, 2004 memorandum also confirms a conversation he had with Plaintiff concerning his failure to attend morning roll call at the building. (Def. 56.1 ¶ 79; Gomez Dep. Exh. 15.) Plaintiff responded that he had not understood he was expected to be at roll call on his very first day and that he had a long walk to the building due to parking difficulties. He acknowledges that Simmons told him he was expected to appear for roll call. (Def. 56.1 ¶ 80, 81; Gomez Dep. at 224, 227.) Plaintiff testified that although, as he told Simmons on May 3, no one had until then told him what time he was expected to report for roll call, he found out when roll calls were held by "ask[ing] every manager, every employee, everything," and "wrote

them down on a sheet of paper so I could keep them with me . . . ." (Gomez Dep. at 226-27.)[5]

### D. Plaintiff's Termination

Plaintiff's employment with Allied continued for just eight more days. On May 11, 2004, Simmons called him to a meeting and said, "Ernest, tell me more about the conversation you had." (Def. 56.1 ¶ 84, Gomez Dep. at 242.) Plaintiff did not explain what previous communication resulted in Simmons asking for "more" information. He testified that he understood the question as a reference to a conversation he had had with Carlos Villareal about an employee attendance problem. When he began describing that conversation, Simmons stopped him and said he "want[ed] to know about the conversation that [Plaintiff] had with Barbara Carley [a Sears Tower manager]." Simmons testified at his deposition that, in a conversation with Ms. Carley before this meeting with Plaintiff, Ms. Carley had expressed "a concern . . . that she was hearing things from [Plaintiff] that she had not heard from us." (Simmons Dep. at 61.)

A memorandum that Simmons prepared on May 11, 2004 provides more detail. (May 11, 2004 Memorandum, Gomez Dep. Exh. 16.) In that memorandum, Simmons recounts receiving a phone call from Plaintiff in which Plaintiff described a conversation he had had that day with Barbara Corley and John Huston, a representative of the new owner of the Sears Tower. In this conversation, Plaintiff had told Simmons, Huston had asked questions about lobby security, and Plaintiff told Huston and Corley about a change in assignment for Carl Reyes and went on to "discuss[] some changes he would recommend in procedures and staffing." (*Id.*) Simmons's memo notes that Plaintiff had reported that "both John and Barbara seemed to be upset by the conversation about Carl." (*Id.*)

The memo states, further, that when Simmons called Plaintiff in to discuss this matter, "his story was slightly different":

---

[5] The court is uncertain why so much effort was necessary to ascertain and then to remember the time of roll call.

8

> He now said that John approached him and asked who he was and he proceeded to tell him about Carlos asking that Carl be reassigned to the builds [sic] he will be handling after the ownership transition. He said they appeared to be upset and he told them of his recommendations to show that he was knowledgeable. I then asked him to explain why he would have this conversation after being specifically told that he was not to do so. He stated that he disagreed with my decision and felt he was in a better position to meet with new management than Mimi or me. He said as the Account Manager he felt it was his responsibility to make the decisions regarding the account and felt he did nothing wrong. He stated that given the opportunity he could have additional conversations with the new management and was certain the client and Allied would see the benefit in his approach.

(*Id.*) Plaintiff contends Simmons's account of this meeting is inaccurate. As Plaintiff recalls the meeting, he acknowledged having had a conversation with Carley and Huston about roses being distributed to Sears Tower employees and about the weather. (Def. 56.1 ¶ 86; Gomez Dep. at 242-43.) Simmons disputed this assertion and reminded Plaintiff, "I told you not to have any conversations about operations with the management." (Gomez Dep. at 243.) In addition, Plaintiff recalls, Simmons said "a bunch of things to me pretty quick":

> He's like, you know, that's not what I told you to do, you know, you didn't go in there with the right attitude . . . . [He told me] I shouldn't have been looking at the budget monies. I shouldn't be talking to anybody about anything Carlos is doing. That my employment was done with Allied. That they were going to give me no other place to go for employment.

(*Id.* at 243-33.) Simmons terminated Plaintiff's employment on May 11, 2004 for the stated reason that he failed to follow instructions on how to perform his duties at the Sears Tower. (Def. 56.1 ¶ 90; Simmons Dep. at 58–59.)

In his opposition to Defendant's motion for summary judgment, Plaintiff asserts that he never talked to Sears Tower management about security procedures or staffing changes; that he never had a conversation in which Sears Tower managers appeared to be upset; and, that, during his employment with Allied, the only conversation he had with John Huston and Barbara Carley was about the weather and the distribution of flowers in the building. (Pl. 56.1 ¶¶ 171–173.) Ms. Carley herself testified about two conversations she had with Plaintiff: one during his employment with Allied and another one shortly after his termination. She did not recall what was discussed during

9

the first conversation and did not believe it was a business discussion. (Carley Dep. at 13.) She recalled the post-termination conversation as a "clandestine meeting at a restaurant across from the Sears Tower, where he gave me some documents" (*id.* at 11); he told her they would reveal that she "wasn't being told about procedures and things that were going on with Allied in the building," but when she inspected them later, they "didn't reveal anything" to her, and she discarded them. (*Id.* at 11, 17–18.)

Allied ordinarily handles employee performance deficiencies through a progressive discipline policy under which an employee receives an oral warning and a first and final written warning before suspension or termination. (Allied Security Officer Handbook, Gomez Dep. Exh. 5.) The policy provides, however, that

> [T]he Company reserves the right to skip any step, in whole or in part, and move immediately to any further step including suspension pending termination as it deems necessary. Consequently, no employee may rely on these guidelines as "promises" or "agreements" by the Company to impose the discipline contained in the guidelines in any situation or prior to termination. Termination may occur without use of progressive discipline and without prior notice.

*Id.*

Plaintiff asserts that he was replaced at the Sears Tower by Mike Gillespie, whom he believes to be a "non-Hispanic Caucasian" because of the spelling of his name. (Pl. 56.1 ¶ 188; Gomez Dep. at 90–91.) He has no non-hearsay evidence of this, however, nor any admissible evidence that it was Simmons who made the decision. (See Gomez Dep. at 84–85, 88–89.) He asserts that Simmons also promoted Peter Moreau, a Caucasian, to the position of Account Manager at the Museum, but again has no admissible evidence of this. (Pl. 56.1 ¶ 189; Gomez Dep. at 91.)

Plaintiff testified that Moreau told him that because most of Allied's clients were white, they wanted "an image that someone would come across as white so that the person's comfortable dealing with someone of their own race." (Gomez Dep. at 326.) Moreau testified that he "would never make any sort of statement to that effect." (Moreau Dep. at 97.) Similarly, though Plaintiff

10

testified that the majority of persons in leadership positions at Allied are white, (Gomez Dep. at 153), John Borgens, who worked in human resources, testified, "that's not true." (Borgens Dep. at 45.) Peter Moreau likewise testified that Allied has "minority management in charge of certain accounts" and white employees in the lower-ranked security-officer position. (Moreau Dep. at 112.) Neither side introduced any statistics concerning the numbers of white and minority employees in Allied's workforce.

### E. Training Concerns

The parties agree that someone in Plaintiff's position who wanted to advance at Allied was encouraged to complete training programs available through the internet, through self-study, and through classes offered periodically for supervisory personnel. (Def. 56.1 ¶ 83.) Simmons explained that those courses were not prerequisites for promotion, but were encouraged, and might be required as part of a probationary process when an employee was promoted. (*Id.* 195; Simmons Dep. at 20.) John Borgens testified that Plaintiff asked him what steps he should take to advance within Allied, and Borgens encouraged him to get training offered by the State of Illinois, to do Internet and library research, participate in Allied's own training programs, and "then, just do a great job." (Borgens Dep. at 29–30.)

Peter Moreau testified that he admired Plaintiff's interest in training and noted that "Allied is very big on training." (Moreau Dep. at 57.) As between two equally-qualified candidates for a position, Moreau explained, a person who had training "will probably" get the job; he stated, nevertheless, that decisions on promotion are not determined by training. (*Id.* at 55.) In fact, Plaintiff understood that training was unrelated to advancement within Allied; he observed, "[V]arious people had not received training and were promoted and other people had taken training and were not promoted." (Gomez Dep. at 82.) He recalled Peter Moreau telling him that with respect to promotion decisions, "this stuff [training] . . . wasn't even looked at" and that "Tony would make [promotion] decisions and it didn't matter whether you had the training or not." (*Id.* at

11

78–79, 98.) Plaintiff testified that Tony Simmons, Peter Moreau, B. J. Jefferson, and John Borgens told him that he needed certain training in order to be promoted, but that this was really "just a company line"; in reality, they told him that "it's pretty much Tony [Simmons]'s decision whether you move up or out and around." (Gomez Dep. at 82.) Plaintiff was unable to identify anyone who had received training and been promoted; the only individual he identified as having been promoted without internal training was Mike Gillespie. (*Id.* at 83.)

On several occasions, Plaintiff made requests for training, but Tony Simmons turned him down for a variety of reasons: that it would interfere with Plaintiff's "responsible duties right now"; that Allied was not offering the particular training class; that Allied would not pay for travel to other locations for training; that Plaintiff was not "at the level that allowed [him] to go to certain trainings"; or that all the training he needed was available on the job. (Gomez Dep. at 76–77.) Mark Anderson told Plaintiff that certain training he had requested would be provided only to Peter Moreau and Greg Prather (Anderson's own supervisor) (*id.* at 105–06), both of whom held higher-ranking positions than Plaintiff. When Plaintiff raised the issue with Mimi Lanfranchi, her response gave him the "general impression that I didn't need anything or they weren't going to get me anything." (*Id.* at 108–09.) On an unspecified date, Plaintiff claims he asked to attend a "subordinate management" class. Peter Moreau told him Allied wasn't offering the training, but Plaintiff's own subordinate, Michael Beck, asked Plaintiff for time off to attend the class himself and told Plaintiff that Tony Simmons had scheduled him for the class. (*Id.* at 99-100.)

On a date not reflected in the record, Plaintiff requested training for certification as a "Cultural Institutional Property Manager"; Allied initially declined this request, but Plaintiff ultimately did attend the training, with his subordinates, at the Museum's expense. (*Id.* at 106–07.) He also took a number of on-line training classes. (Pl. 56.1 ¶ 103.) He attended training for a couple of days at the "Allied Academy" and for two days at "Allied University." (*Id.* ¶ 104.) In addition, he completed a 20-hour basic training course sponsored by Allied, a First Aid and Bloodborne

12

Pathogen Training in December 2003, and a fire officer's training course. (*Id.* ¶¶ 105–107.)

## DISCUSSION

### A. Summary Judgment Standards

The standards for granting summary judgment are familiar. Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether there is a genuine issue of fact, the court construes the facts, and draws all reasonable inferences, in the light most favorable to the party opposing summary judgment. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The court is not, however, required to "draw every conceivable inference from the record," *Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004) (quoting *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003)), and inferences supported only by speculation or conjecture will not defeat a summary judgment motion. *McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004).

### B. Proof of Employment Discrimination

A plaintiff may establish a claim of employment discrimination under either the "direct" or the "indirect" method. Under the direct method, plaintiff may rely on direct evidence—which in an employment case usually requires an admission—or circumstantial evidence of an unlawful motive for the employment decision. *See Rudin v. Lincoln Land Community College*, 420 F.3d 712, 720 (7th Cir. 2005) (citing *Logan v. Kautex Textron N. America,* 259 F.3d 635, 638 (7th Cir. 2001)); *Rogers v. City of Chicago,* 320 F.3d 748, 753 (7th Cir. 2003). Under the indirect, or "burden-shifting" method, plaintiff proceeds by demonstrating that (1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) other similarly-situated employees who were not members of the class were treated more favorably. *Rozskowiak v. Village of Arlington Heights*, 415 F.3d 608, 614 (7th Cir. 2005).

If the plaintiff makes such a showing, defendant bears the burden of presenting evidence of a legitimate, non-discriminatory reason for the adverse employment decision. *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005). If defendant does so, plaintiff bears the burden of proving that the defendant's explanation was pretextual. *Id.* Such proof "requires more than showing that the decision was 'mistaken, ill considered or foolish, [and] so long as [the employer] honestly believes those reasons, pretext has not been shown.'" *Id.* (quoting *Jordan v. Summers,* 205 F. 3d 337, 343 (7th Cir. 2000)). "[P]retext means a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000). In its most recent comment on the subject, the Seventh Circuit explained that a pretext is "to repeat, a deliberate falsehood. . . . . An honest mistake, however dumb, is not, and if there is no doubt that it is the real reason it blocks the case at the summary-judgment stage." *Forrester v. Rauland-Borg Corp.,* ___ F.3d ___, No. 05-4650, 2006 WL 1767760, *3 (7th Cir. June 29, 2006).

**C.**
**Training and Transfer**

Defendant argues that there are no disputes of material fact concerning Plaintiff's claims of discrimination in training, in the transfer decision, or in his discharge. In his opposition to this motion, Plaintiff has not argued that the circumstances surrounding his transfer to the Sears Tower and the denial of training opportunities constitute independent claims of discrimination, but instead that they are evidence that his discharge was unlawfully motivated. (Pl.'s Mem. in Opp'n to Def.'s Motion for Summary Judgment [hereinafter, "Pl. Mem."], at 13–14, 14 n.3.) In any case, the court agrees with Defendant that the evidence does not support a claim for discrimination on either of these bases.

"A discriminatory denial of job-related training can constitute an adverse employment action under Title VII." *Durkin v. City of Chicago*, 341 F.3d 606, 611 (7th Cir. 2003) (citing *Pafford v.*

14

*Herman*, 148 F.3d 658, 667 (7th Cir. 1998)).[6]  It is undisputed that Plaintiff was eager for training and that, in his eight-month tenure with Allied, he in fact did avail himself of a number of training opportunities.  The fact that other requests were denied does not satisfy the court that national origin discrimination was at work here; Plaintiff testified to his belief that one of his subordinates attended a training session that he was denied permission to attend, but he offers no admissible evidence to this effect.  By Plaintiff's own account, Simmons always offered work-related reasons for denying his requests.  Most significantly, Plaintiff presented no evidence of any similarly-situated worker whose requests for training were granted.

Nor is the court moved by Plaintiff's contention that his transfer to the Sears Tower was a function of animus on the basis of his national origin.  As noted, Plaintiff has not argued that the assignment is independently actionable; for purposes of this analysis, the court will assume that Plaintiff's assignment to the Sears Tower was a demotion, though this is far from certain.[7]  Plaintiff's title at the Sears Tower, "Account Manager," was in the Allied hierarchy a higher-level position than

---

[6] Defendant asserts that promotions at Allied are not linked to training.  (Def. 56.1 ¶ 91.)  Plaintiff disputes this, but he himself testified that with respect to promotions, training "didn't matter" and "wasn't even looked at."  *Cf. Pafford,* 148 F.3d at 667 (discriminatory failure to train is actionable regardless of whether training is material to promotion).

[7] The Seventh Circuit has defined "adverse employment action" broadly. *Smart v. Ball State University,* 89 F.3d 437, 441 (7th Cir. 1996); *McDonnell v. Cisneros,* 84 F.3d 256, 258-59 (7th Cir. 1996); *Collins v. Illinois,* 830 F.2d 692, 703 (7th Cir. 1987) (adverse employment action is "not limited solely to loss or reduction of pay or monetary benefits. It can encompass other forms of adversity as well.") Nevertheless, it is well established that "not everything that makes an employee unhappy is an actionable adverse action," *see, e.g., Bell v. E.P.A.,* 232 F.3d 546, 555 (7th Cir. 2000) (citation omitted), and a transfer involving no reduction in pay and no more than a minor change in working conditions is not deemed materially adverse. *See O'Neal v. City of Chicago*, 392 F.3d 909, 913 (7th Cir. 2004) (transfer from administrative sergeant to beat sergeant did not constitute adverse action); *McKenzie v. Milwaukee County*, 381 F.3d 619 (7th Cir. 2004) (no adverse action as a result of sheriff deputy's transfer from one division to another); *Stutler v. Illinois Department of Corrections,* 263 F.3d 698, 702--03 (7th Cir. 2001) (lateral transfer that did not reduce employee's responsibilities or benefits not actionable); *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir. 1993) (no materially adverse action where plaintiff was transferred from assistant vice president to loan officer and his responsibilities changed, but salary and benefits remained the same).

the Operations Manager post he held at the Museum. Although his annual salary— a function of negotiation between Allied and its client at each location—dropped from $45,000 to $40,000, he was eligible for a bonus at the Sears Tower. Although Plaintiff testified that the position he was offered at the Boeing building would have entailed a significant pay cut and staff reduction, there is no indication in the record of the size of staff Plaintiff supervised at the Sears Tower. In any event, Plaintiff has offered no evidence that in suspending him from his position at the Museum and reassigning him to the Sears Tower, Allied treated him less favorably than any similarly-situated worker outside the protected class. Plaintiff appears to believe he meets this burden on the strength of Peter Moreau's testimony that no member of Allied management had ever been subject to the "zero tolerance" policy for use of profanity. That testimony is insufficient, however, where there is no evidence that another Allied manager (or, indeed, any other Allied employee) used profanity but received less harsh treatment. Plaintiff bears the burden of making such a showing. His assumption or belief that the female Museum employee who cursed at him was not disciplined is not sufficient. There is no evidence that her own supervisors even became aware of her misconduct, let alone any evidence that they took no action. Moreover, the fact that Museum managers may have chosen to give one of their own employees a second chance or even a pass with respect to a rules violation would not demonstrate that Allied treated any similarly situated worker more favorably than Plaintiff. Finally, Plaintiff's own response to Simmons's decision just a few days later to reassign him—surprise and happiness—defeats his contention that the assignment to the Sears Tower was adverse.

### D. Termination

The court turns, finally, to analysis of Plaintiff's claim that his termination was a product of national-origin discrimination. To prove this claim, Plaintiff must show that he was a member of a protected class, that he was meeting his employer's expectations, that he suffered an adverse

16

employment action and that similarly-situated employees outside the protected group were treated more favorably. The parties agree that Plaintiff is a member of a protected class and that he was terminated, but Defendant urges that Plaintiff has not established either of the remaining elements of his prima facie case. According to Defendant, Plaintiff's contacts with Sears Tower managers John Huston and Barbara Carley were in direct violation of Tony Simmons's direction that Plaintiff handle the operational-security function, and leave management communication to Simmons himself. He was, therefore, not meeting his employer's legitimate expectations. Viewed another way, if Plaintiff's competent handling of security functions is sufficient to establish his prima facie case, Allied argues that Plaintiff's failure to honor Simmons's direction in this regard constitutes a legitimate, nondiscriminatory reason for his discharge. In any event, Defendant contends, Plaintiff has offered no evidence that it treated any similarly-situated worker more favorably, and has no admissible evidence for his assertion that he was replaced at the Museum and at the Sears Tower by someone outside the protected group.

The court agrees that Simmons's belief that Plaintiff had discussed management issues with Sears Tower management personnel, contrary to Simmons's direction, constitutes a legitimate, non-discriminatory reason for his discharge that defeats any inference of discrimination here. Plaintiff now has no recollection of any such conversation, and it is at least possible that the conversation never happened. But Plaintiff's own testimony satisfies the court that Simmons genuinely believed such a conversation had taken place, a belief sufficient to support summary judgment. *See Ballance*, 424 F.3d at 617; *Little v. Illinois Dept. of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004) ("This circuit adheres to the honest-belief rule: even if the business decision was ill-considered or unreasonable, provided that the decisionmaker honestly believed the nondiscriminatory reason he gave for the action, pretext does not exist."). If Simmons were fabricating the incident rather than investigating something Plaintiff himself had reported, it would

17

make no sense for him to begin the meeting with Plaintiff by asking him to "tell me more about the conversation you had." Among a "bunch of things" that Plaintiff recalls Simmons saying to him in that meeting was that "I shouldn't be talking to anybody about anything Carlos is doing"—a comment that responds directly to matters that, according to Simmons's contemporaneous memorandum, Plaintiff himself reported to him.

Significantly, if Simmons harbored some discriminatory animus against Plaintiff on the basis of his national origin, it makes no sense for him to have assigned him to the Sears Tower job just a few weeks earlier. When an employee is hired (or, in this case, reassigned) and fired by the same decision-maker in a relatively short time span, a presumption arises that the firing is not a product of discrimination. *Roberts v. Separators, Inc.*, 172 F.3d 448, 452 (7th Cir. 1999); *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 399 (7th Cir. 1997). In April, Plaintiff acknowledged having used foul language in a meeting with a Museum employee. And just one week before his discharge, Simmons had met with Plaintiff to chastise him for another incident in which Simmons believed Plaintiff had engaged in an unauthorized contact with Sears Tower managers and had failed to attend roll call. If he had been looking for an excuse to terminate Plaintiff on the basis of his national origin, it would have been much easier for him to do so on the basis of an admitted transgression than on the basis of an episode Plaintiff denies.

All that remains of Plaintiff's case, in the court's view, is his testimony that Peter Moreau, who hired him, made comments to Plaintiff about his own race or that of other employees. Moreau has denied these statements, but accepting Plaintiff's testimony as true, the court concludes they do not defeat summary judgment. As Plaintiff portrays those statements, they do little to reveal discriminatory animus; instead, Moreau suggested that Plaintiff's status as a member of a minority group who appeared "white" enhanced his appeal to Allied. In any event, Moreau himself was not the decision maker. *Hunt v. City of Markham*, 219 F.3d 649, 652 (7th Cir. 2000) ("[T]he fact that

someone who is not involved in the employment decision of which the plaintiff complains expressed discriminatory feelings is not evidence that the *decision* had a discriminatory motivation.") (emphasis in original; collecting cases). Nothing about any of Moreau's comments can be understood as evidence that Simmons would, soon after assigning Plaintiff to a significant operational role at the Sears Tower, discharge him on the basis of his national origin.

## **CONCLUSION**

Defendant's motion for summary judgment (14) is granted.

ENTER:

Dated: July 18, 2006

_____
REBECCA R. PALLMEYER
United States District Judge